For plaintiff: Fergus J. McOsker.

For defendant: Isadore S. Horenstein.

The Columbian National
Life Insurance Company
vs.     Eq. No. 11658.
Industrial Trust Company, et al.

October 5, 1934.

CHURCHILL, J. Heard on bill, answers of the respondents and proof.

By this proceeding in equity the complainant seeks to cancel the reinstatement of a policy of life insurance issued by the complainant to Timothy V. Wholey, under which policy Elizabeth V. Wholey, wife of Mr. Wholey, was the beneficiary. The Industrial Trust Company has an assignment of the policy by way of security.

The case went to the Supreme Court on demurrer to the amended bill. That Court held that the bill made out a case for relief. (53 R. I. 334).

The case was heard on the bill which was before the Supreme Court and on certain amendments made during the hearings before this Court.

The bill and amendments thereto pray for cancellation on the grounds: that the policy lapsed; that Mr. Wholey failed to disclose that he had suffered attacks of angina pectoris while his application for reinstatement was pending and that he died of such disease on May 3, 1932, and that such non-disclosure voids the reinstatement; that in his application for reinstatement he had falsely answered certain questions relative to consulting physicians and in regard to the state of his health; that such answers were warranties and such breaches of

warranty also entitle the complainant to cancellation.

The respondents defend on divers grounds, the principal grounds being that the company waived any lapse of policy; that the insured was entitled to reinstatement without additional premium being exacted by the insurer; that the date of the alleged attacks of angina pectoris, which it is claimed Mr. Wholey failed to disclose, was subsequent to the date of reinstatement and hence immaterial; that Mr. Wholey was in good health and did not suffer from attacks of angina pectoris or, to put the case exactly as the respondents have argued it, that the company has failed to prove that Mr. Wholey was not in good health and has failed to prove that he suffered from attacks of angina pectoris or that he died from that malady; and they further take the position that in point of fact the assured died from a cerebral disorder; that the company was guilty of laches in moving for cancellation and rescission; and the respondents pray in the way of cross relief that the policy be declared in force; that the company be ordered to pay the amount of the policy together with the amount of the extra premiums paid by Mr. Wholey on the policy.

### I. *Lapse of Policy.*

The company issued its policy No. 143,356 to Timothy V. Wholey on June 2, 1925. It provided for the payment to his beneficiary, on the death of the assured, of the sum of $250 a month until 120 payments had been made. It was incontestable after the policy had been in force for the period of a year. The annual premium was due each year on June 2 and was payable in advance.

On February 2, 1931, Mr. and Mrs. Wholey assigned all their right, title and interest in and to the policy to the Industrial Trust Company. No question is raised as to the validity of this assignment.

The premium due on June 2, 1931, was, by an agreement between Mr. Wholey and the insurer, paid partly in notes. On July 2, 1931, Mr. Wholey executed and delivered a series of eleven premium notes covering the premium year beginning June 2, 1931. Each note was in the sum of $97.11, the first note being due August 10, 1931, the others one each month thereafter. Each note contained the provision that "it is given with the full knowledge and intent on my part that if it is not paid when due, without grace, said policy shall without further notice become void and the insurance thereunder then terminate subject to the conditions contained therein relating to surrender values".

Some of these premium notes were taken up by partial payments and the unpaid balance covered by other notes. One such note for $64.96 was due on October 24, 1931. It contained a like clause to that set forth above respecting the effect of non-payment of the note on its due date. This note was not paid when due on October 24, 1931, and I rule that therefore the policy No. 143,356 lapsed.

The policy provided that "should this policy lapse it may be reinstated at any time upon evidence of insurability satisfactory to the company * * *".

A Miss O'Connor was the cashier of the local branch of the insurance company in Providence. After October 24, and before any payment had been made by Mr. Wholey on the note due on October 24, 1931, she communicated with Mr. Wholey by telephone. She told him that the policy had lapsed. He replied that he would fill out an application for reinstatement (called in this case "health certificate"). Miss O'Connor thereupon sent Mr. Wholey a form document used in applications for reinstatement to be executed by

him. This was sent to him on October 29, 1931, together with a letter of transmittal, which read in part: "upon receipt of the completed form same will be forwarded to our home office for approval".

The application for reinstatement contained this clause: "I further agree that said policy or policies shall not be considered reinstated or in force by reason of any cash paid or settlement made in payment or on account of said premiums or note until formal approval is given at the home office of the company at Boston, Mass., with delivery of receipt for said premium or of said note and I agree to accept the return of any payment made on account thereof if the company shall decline to approve".

There had been previous lapses of this policy and on each occasion Mr. Wholey had executed an application for reinstatement containing a clause of like tenor.

Mr. Wholey, on October 30, 1931, executed the application for reinstatement, sent such application to the local agency in Providence, from whence it was transmitted to the Boston office of the insurer.

October 29, 1931, Mr. Wholey sent a check for the amount of the note due on October 24 to the local agency in Providence and it was received at this agency after Miss O'Connor had sent to Mr. Wholey the application for reinstatement which he executed on October 30, 1931. The application contained a statement that policy No. 143,356 had lapsed.

In answer to several questions propounded in the application, Mr. Wholey in his own handwriting stated that he had not been ill since last examined for the company; that he had not consulted a physician since last examined, and his answer to a question if he was in sound health was, "I believe so".

The check sent by Mr. Wholey for the amount of the note of October 24, 1931, was deposited in the bank by Miss O'Connor and was paid through the Providence Clearing house on November 2, 1931.

Only one further payment was made on the premium notes maturing respectively on November 10 and December 10, 1931, and on January 10, 1932. A payment of $31.58 was made on November 10, 1931, and a note given on that date payable November 24, 1931, for $65.53, which was not paid.

Mrs. Wholey takes the position that the insurer waived its right to treat the policy as lapsed on account of its acceptance of the amounts due on the premium notes on October 24, 1931, and November 10, 1931.

This position is untenable. It is clear on the facts that payment by the check of October 29, 1931, and the payment of November 10, 1931, were received by the company subject to the non-waiver agreement which has been recited.

I rule, in view of this finding of fact and of the course of conduct between Mr. Wholey and the insurer previous to and after October 24, 1931, and including the terms of a second application for reinstatement made by Mr. Wholey on November 12, 1931, that the complainant did not waive its right to treat the policy as lapsed.

## II. Reinstatement.

After receipt of the application for reinstatement, the home office of the company requested the assured on November 6, 1931, to furnish medical evidence of insurability in connection with the reinstatement of the policy. This was done through Miss O'Connor, who wrote Mr. Wholey on November 7, 1931, informing him that a medical examination would be necessary "before they will approve reinstatement of your policy No. 143.356". This letter gave the names of three doctors, any one of whom the assured might

select to make an examination. The fee was to be paid by the company.

Among the physicians whose names were given to Mr. Wholey was Dr. M. J. Nestor, who was Mr. Wholey's personal physician. He, however, selected Dr. Prescott T. Hill. He was examined by Dr. Hill on November 12, 1931, and at that time signed and delivered another application for reinstatement containing the same non-waiver clause respecting receipt of premiums or payment of premium notes. The application also included a clause, a portion of which reads:

"I further agree that any untrue statement made herein shall operate to limit the company's liability under said policy or policies to that which exists at this date, if any, with (A) the return of payments, if any, made in connection with this application for reinstatement, or (B) the return of any payment made in connection with this application for the placing in force of said policy or policies".

In the application was contained a schedule of questions and among them questions under Section D thereof to be answered by the assured. These questions were put to Mr. Wholey by Dr. Hill, who wrote the answers as given by Mr. Wholey. Three of the questions and answers were:

"1 A. Have you been ill since you were last examined for this company? A. No.

B. If so, state the nature of the illness, date and duration. B.—

2 A. Have you consulted a physician since you were last examined for this company? A. No.

B. If so, whom, for what, and when? B.—

C. May the company consult your physician? C.—

"6. Are you now in sound health? A. Yes."

After Dr. Hill had filled in the answers, Mr. Wholey read them and signed the form under the words: "I warrant each of the above answers to be full, complete and true".

Dr. Hill made a physical examination on behalf of the company and recommended the acceptance of the risk "except for over weight".

The company was not willing to reinstate on the strength of this last report and statement but requested a further examination. Such further examination was made by Dr. Hill in respect to blood pressure. Dr. Hill was also 'directed to and did question Mr. Wholey as to dietary treatment, treatment for blood pressure and as to the names and addresses of all physicians whom he had consulted during the past five years. Information was elicited from Mr. Wholey by Dr. Hill and transmitted to the company as to being on a diet for some months under the direction of Dr. Frank M. Cummings. Mr. Wholey also stated to Dr. Hill that he had consulted Dr. A. J. Lalonde and Dr. Palmer. Dr. Hill did not discover, nor was he told by Mr. Wholey of any abnormal condition of the heart, or of any illness or any unusual physical condition, except those for which he was treated by Dr. Cummings and Dr. Lalonde. Mr. Wholey did not tell Dr. Hill that he had consulted any physician other than Cummings, Lalonde and Palmer, and he did not tell Dr. Hill that he had suffered any attacks of angina pectoris or pseudo angina.

The company communicated with both Dr. Cummings and Dr. Lalonde and neither of these physicians indicated that Mr. Wholey had suffered from indigestion, angina pectoris or pseudo angina.

In view of the information which it had received, the company decided that it would not reinstate the policy at the premium rate theretofore charged and this decision was based on the fact that between the time the

policy had been taken out and the time of the application for reinstatement, Mr. Wholey's weight had been excessive, his blood pressure had been elevated and his weight and blood pressure had been reduced by dieting and treatment.

The assured was notified of the position of the company on December 11, 1931, to the effect that "the application for reinstatement of the above policy has been approved subject to Table D rating. If the assured is willing to accept reinstatement on this basis, kindly let us know".

Table D rating carried a materially increased premium.

When notified of the attitude and position taken by the company in respect to the increased premium, Mr. Wholey asked for further information, and just before or just after December 24, 1931, and at any rate after December 15, 1931, Mr. Wholey was advised of the exact amount which would be called for under the new rating, and at no time before January 5, 1932, did Mr. Wholey agree to pay the extra premium required and demanded by the company.

At this point it is necessary to consider the claim of both respondents that on the lapse of the policy Mr. Wholey had the right under the policy to call for reinstatement at the same premium which was in force before October 24, 1931. This contention of the respondents is based on the proposition that the company had no right to impose the extra premium since the proof of insurability submitted by Mr. Wholey should have been satisfactory and the company acted in an arbitrary and unreasonable manner in demanding an increased premium.

The position taken by the respondents can not be sustained.

(A) The proof shows that the company acted reasonably and in accordance with life insurance underwriting practice.

The increased premium was based on the fact that between 1925 and the time when application for reinstatement was made Mr. Wholey had been greatly over weight, had a high blood pressure, and had been treated for both these conditions. These facts in underwriting practice placed a man of Mr. Wholey's age in the class of impaired risks. On this point there was no evidence to the contrary.

(B) Mr. Wholey waived his right to reinstatement at the previous premium rate by the action which he subsequently took in agreeing to reinstatement at the new rate of premium.

As the evidence shows, the parties came to an agreement on a new rate and there is nothing in the record to show, nor is there pleaded any mistake on the part of Mr. Wholey or anything which savors of misrepresentation on the part of the company.

Under such circumstances, Mr. Wholey must be held to have waived his right to insist on reinstatement at the old rate and such waiver binds his beneficiary and assignee.

*Umans* vs. *New York Life Insurance Co.*, 259 Mass. 573.

Not squarely in point but looking in the same direction:

*Wells* vs. *Great Eastern Casualty Co.*, 40 R. I. 320.

(C) The facts disclosed at the hearing and referred to later herein show that Mr. Wholey had concealed from the company the fact that he had consulted Dr. Nestor, Dr. Hamel and Dr. Jones prior to the application for reinstatement, and concealed symptoms which led him to consult these physicians.

The cross bills are in reality for specific performance to reinstate the policy on the old premium basis and for a decree compelling payment. In such a proceeding the respondents are bound by the acts of Mr. Wholey, the contracting party, whose rights they now seek to enforce. His concealment

of vital information from the company was such as to preclude relief in an equitable action to enforce his right to reinstatement.

(D) Mr. Wholey was not an insurable risk at the time he applied for reinstatement. In view of the findings of fact later made in this rescript, it is clear that Mr. Wholey had suffered from attacks of angina pectoris previous to his application for reinstatement and it is undisputed on the evidence that a history of such disease, or even symptoms which suggested the possibility thereof, made him uninsurable at any rate of premium.

III. *Date and Place of Reinstatement.*

After Mr. Wholey obtained information of the amount of the increased premium, which was at a time just before or just after December 25, 1931, he told Miss O'Connor, the cashier of the local agency in Providence, that he would reinstate the policy provided the balance due of $1077.74 could be paid in six monthly payments, the first payment to be due January 15, 1932. This proposal was transmitted to the home office in Boston on January 5, 1932, and on January 7, 1932, the assistant actuary of the company advised Miss O'Connor that there was "no objection to the insured's paying the balance of $1077.74 in six equal payments, the first falling due January 15, 1932, provided the outstanding balance each month is covered by notes".

On January 8, 1932, Miss O'Connor sent to Mr. Wholey six notes payable on the 15th of each month beginning in January and each in the sum of $179.62, and in her letter said: "Referring to the balance of $1077.74 which is due to reinstate your policy and pay the annual premium which was due June 2, 1931, we wish to state that we are enclosing herewith six notes made payable on the 15th of each month, from January to June.

These payments will amount to $179.62; the first one will be due January 15th. Kindly sign the same and return to us at your earliest convenience."

Mr. Wholey did not pay the note due on January 15, 1932, but paid $78.92 on that date and sent Miss O'Connor a note for $100.70 falling due on February 15th, and returned also five notes signed by him and falling due February 15, March 15, April 15, May 15, and June 15, 1932, and each for $179.62. No receipt was given by Miss O'Connor for the check or notes. The check was deposited for collection and the notes forwarded to the Boston office of the company.

When the notes were received, the home office of the company reinstated the policy. It executed a document (called a Rider) which, disregarding headings, reads thus:

"Rider to be attached to and form a part of Policy No. 143,356.

Life of Timothy V. Wholey.

In consideration of the reinstatement of this policy it is hereby provided and agreed that an extra annual premium shall be added to this policy based on Table D rating to become effective December 8, 1931.

The amount of the extra premium due from December 8, 1931, to June 2, 1932, is Three Hundred Eight and 03/100 Dollars ($308.03) with subsequent annual premiums becoming due on June 2nd of each year of One Thousand Eight Hundred Three and 03/100 Dollars ($1803.03) which includes an extra annual premium of Eight Hundred Eleven and 78/100 Dollars ($811.78).

The Columbian National Life Insurance Company Boston, Mass. 15th day of January, 1932.

R. E. Peirce,
Ass't. Secretary."

On January 23, the home office issued a premium receipt and mailed the receipt, the rider and the old notes

to its agent in Providence, who mailed them to Mr. Wholey on January 25, 1932.

It is vigorously argued that the reinstatement was effective as of December 8, 1931, and many cases are cited in support of this position, but the decision of the Supreme Court in this case (53 R. I. 334) concludes this point. The essential facts which were before that Court on this point on the face of the bill have been proved by the complainant and any variation between proof and allegation is immaterial.

The Supreme Court held as follows:

"The policy lapsed in October, 1931. Wholey's application in November for reinstatement of the policy was not agreed to by the insurer. It was plain that the insured could not have compelled the insurer to reinstate him on the terms of the old policy nor did he ever assert a right to do so. He had changed from a standard to a substandard risk. To again secure insurance he was required to pay an additional premium established for a different class of risk. On January 7, 1932 he offered to pay the additional premium. He paid it on January 15 and on that date the contract of insurance was made when the insurer accepted his offer at its home office in Boston and affixed a rider to the policy containing the terms of the new agreement. The terms of the contract of reinstatement were not fixed by the old policy but were the result of negotiations between the parties.

The last act essential to the meeting of the minds of the parties was done in Boston and the contract as thus appears was made in Massachusetts.

The provision in the rider that the additional premium on the new rating should become effective December 8, 1931 had no effect upon the time when the contract was made."

I find that the contract of reinstatement was not made until the home office of the complainant accepted the notes, and I rule that the contract of reinstatement was made in Boston, Massachusetts.

IV. *The physical condition of Timothy V. Wholey and cause of death.*

The questions involved in the foregoing matters considered under I, II and III herein involve for the most part undisputed matters of fact.

The physical condition of Mr. Wholey during the year 1931 and in 1932 down to the time of his death on May 3, 1932, and the cause of death are matters which are in sharp dispute.

It is asserted by the complainant that early in 1931 Mr. Wholey displayed symptoms indicating the possibility of angina pectoris; that during the summer of 1931, he had at least one attack of that disease; that on December 13, 1931, he showed further symptoms of such disease, and on December 15, 1931, he had a rather severe attack and died subsequently, of angina pectoris and myocarditis on May 3, 1932.

On the other hand, the respondents take the position that complainant has failed to show by clear convincing evidence that Mr. Wholey was afflicted with angina pectoris; that he ever had such attacks, or that he died of such disease, but on the contrary produced testimony, both lay and professional, that the disorder Mr. Wholey suffered in 1931 was of digestive character; that he received an injury to the head on March 5, 1932, when he was involved in an automobile accident and that he died as a result of a cerebral disorder caused by such head injury.

Much expert testimony was introduced on each side but there is little real dispute between the expert witnesses called on the one side or the

other on the same assumed state of facts. The crux of the controversy lies further back on the realm of fact.

Before coming to the consideration of the testimony, it may be well to state here that the medical testimony shows that angina pectoris is a term used by physicians to describe both the symptoms of a disease and the disease itself, which is a disease of the coronary artery and frequently is not discoverable by a physical examination, and I find in this connection that life insurance companies will not insure persons who have had attacks of angina pectoris or have displayed symptoms of such a disease.

The pertinent medical history begins on January 22, 1931. Dr. M. J. Nestor testified that on that date he called on Mr. Wholey twice for bronchial trouble and that at that time Mr. Wholey complained of symptoms which indicated to the physician the possibility of angina pectoris. Mrs. Wholey denied that Dr. Nestor called that day to visit her husband but testified that the calls were on her son, who was in Brown'. University but was unable to attend his course because of an attack of pneumonia. The accuracy of her testimony is shaken by the records of the University which show that her son did not enter until the fall of 1931 and that his illness was in 1932.

July 7, 1931, is the next date of importance. Mr. Wholey and his family spent the summer of 1931 at Old Orchard, Maine. July 7, 1931, Dr. John R. Hamel, who was located in Portland, some sixteen miles from Old Orchard, was summoned to attend Mr. Wholey. He stated he gave a diagnosis of angina pectoris both to Mr. Wholey and to his daughter, Mrs. Welch, who was present at the time. Mrs. Welch admitted that Dr. Hamel so stated the character of the attack to her. Mrs. Wholey was not at home

at the time of the visit but returned before Dr. Jones was called.

Dr. Arthur P. Jones of Old Orchard was called by Mr. Wholey's son Arthur to visit his father later in the day. He found him uneasy and restless, got a history, either from Mr. Wholey or Mrs. Wholey, of difficulty in breathing and pain around the heart. He gave him a hypodermic injection and left sedatives to be administered.

Mrs. Wholey denied that either she or her husband had described his symptoms to Dr. Jones as Dr. Jones testified and she ascribed the attack of that day to indigestion.

On July 16, 1931, Dr. Jones in response to a request sent Mr. Wholey more sedative pills.

On July 20, 1931, while Mr. Wholey was in Providence, he consulted Dr. Nestor and, according to the doctor, complained to Dr. Nestor of slight substernal pain which indicated the possibility of angina pectoris.

On December 13, 1931, Mr. Wholey called at Dr. Nestor's office and consulted him in respect to a digestive disturbance and at the same time complained of "pain and griping in the chest and pain and numbness radiating from his left arm with his digestive disturbance and gas".

Dr. Nestor examined his heart and gave his opinion to Mr. Wholey at that time he "was having distinct anginal symptoms". Nitroglycerine tablets and anyl-nitrate were prescribed.

On December 15, 1931, Dr. Nestor was called to the residence of Mr. Wholey by Mrs. Wholey. This was in the evening. Dr. Nestor testified he found Mr. Wholey "sitting in a chair * * * very pale, profuse perspiration and the history of having had a severe pain in his chest and radiating down his arm and shoulder * * * it was scattered pretty much over the precordia, that is, over the heart area". Dr. Nestor diagnosed the

attack as angina pectoris and prescribed the appropriate remedies, and advised rest and quiet and curtailment of activities.

Mrs. Wholey denied that Dr. Nestor diagnosed the attack as angina, at least she did not hear him so describe it. She said it was an attack of indigestion, that he had been subject to such attacks for a long time and that she called Dr. Nestor because she did not have an emetic in the house which she was accustomed to use when such attacks were experienced.

On March 5, 1932, Mr. Wholey was involved in an automobile accident and was attended by Dr. William Sullivan. Dr. Sullivan's testimony is considered later in this rescript.

On the morning of May 2, 1932, Dr. Nestor testified he was called to attend Mr. Wholey at the office of the Wholey Boiler Works in Providence. He described his condition thus: "He was sitting in a chair in the inner office and his appearance was that of a man very badly shocked. He was covered with perspiration, very pale, had an expression of anguish * * * and he was holding his hand to his chest and he looked very—a very sick man." "He told me he had this terrific attack, pain in his chest radiating down his left arm and he was very, very uncomfortable."

Some time after Dr. Nestor's arrival, Dr. William Sullivan came. Dr. Nestor diagnosed the attack at that time as angina pectoris and prescribed and administered remedies and restoratives. Dr. Sullivan did not recommend any different treatment.

Dr. Nestor took Mr. Wholey to his home. He saw him again in the evening when he found him, as he described it, "his condition was improved and while he still had cardiac symptoms and still had pressure without pain in the sense of stricture without pain in his chest and irregular pulse, his condition generally was better but

none too well." He called at the house the next morning and found that Mr. Wholey was dead.

In the opinion of Dr. Nestor the cause of death was angina pectoris and myocarditis, related diseases of the heart.

On May 23, 1932, Dr. Nestor executed the attending physician's certificate to the company, in which he stated that the cause of death was angina pectoris—myocarditis, and on the same date the respondent Elizabeth V. Wholey signed a proof of death in which the cause of death was stated to be "heart attack following automobile accident" and that his health first became affected in December 1931.

At this point it becomes necessary to examine the testimony of Dr. Sullivan and of Mrs. Wholey for their testimony forms the chief basis of the hypothetical questions to the expert witnesses called by the respondents and the basis of the claim that Mr. Wholey died of a cerebral disorder.

Dr. Sullivan on the stand disagreed with the diagnosis of Dr. Nestor as to the cause of death. Dr. Sullivan was well acquainted with Mr. Wholey but had not been called at any of the attacks which Dr. Nestor described except at the time of the attack at the office on May 2, 1932. He had, however, been the attending physician of Mr. Wholey after the automobile accident of March 5, 1932, and testified that his death was due to a cerebral condition, possibly subdural and caused by the accident of March 5, 1932. He testified that he saw Mr. Wholey daily from March 5th through March 15th, 1932, and then at less frequent intervals, the last visit being in April 1932.

In a report to the United States Casualty Company made in respect to the injuries sustained by Mr. Wholey on March 5, 1932, and made about April 18, 1932, Dr. Sullivan stated that

Mr. Wholey had suffered cerebral concussion but that he was cured; that no further treatment was necessary; that total disability had ended and there was no probability that the injuries sustained would end in death or permanent impairment of function. In a word, he reported Mr. Wholey as cured on April 17, 1932, after having treated him since the accident.

On May 23, 1932, Dr. Sullivan executed and made oath to a certificate accompanying proof of claim under the policy here in question, in which he stated that the exact cause of death was "probably angina pectoris".

In addition to these grave self contradictions embodied in documentary form and both issued on serious occasions calling for his best opinion, the witness involved himself in numerous contradictory statements and took positions in some instances in variance with the medical testimony on both sides. Space forbids further analysis of his testimony. It is enough to say that the Court can not accept his testimony.

The other witness who professed to give a rather detailed account of the condition of Mr. Wholey on various occasions is Mrs. Elizabeth V. Wholey. Some aspects of her testimony have been referred to and on most points it is in direct conflict with all the medical men who attended Mr. Wholey on the occasions when, in their opinion, he was suffering from angina pectoris.

Reference has been made to her signature to the proof of death filed with the company. It is further in evidence that she executed a similar document for the Puritan Life Insurance Company in which she certified that death was due to angina pectoris "which started about a year ago". It is fair to add that she testified in substance that she was in such a condition following Mr. Wholey's death that she did not know what she signed. If this explanation modifies the apparent self contradiction, other facts in the record shaking her testimony remain.

She testified in chief that during the summer of 1931, Mr. Wholey had not been attended by any physicians. It was proved by disinterested witnesses that this was not correct.

The inaccuracy of her testimony in respect to the visit of Dr. Nestor on January 22, 1931, has been referred to.

Weighing all her testimony, the Court can not give it sufficient credibility to put the testimony of Dr. Nestor in doubt where the two are in conflict.

Space does not permit exposition or analysis of the testimony of the sons of Mr. Wholey who testified as to the events at the Wholey Boiler Works on the morning of May 2, 1932, and the condition of Mr. Wholey at that time. The Court has not overlooked their testimony which was in conflict with that of Dr. Nestor on many points, particularly as to the condition of Mr. Wholey on the morning of May 2, 1932.

Dr. Nestor was a skilled observer and his opinion expressed on the stand was consistent with his opinion given when he signed the certificate setting forth the cause of death. He was a friend of the Wholey family of many years' standing and gave his testimony with reluctance but with obvious sincerity. His opinions are consistent with the opinions of the physicians called as expert witnesses. No possible motive is suggested which would cause Dr. Nestor to falsify on the matters of fact to which he testified. The Court accepts his testimony.

Dr. Hamel and Dr. Jones were disinterested witnesses and the Court accepts their testimony.

The credible testimony supporting the following findings of fact is clear and convincing.

I find:

that Dr. Nestor attended Mr. Wholey

twice on January 22, 1931, and attended him on July 20, 1931, and on one or more of these occasions Mr. Wholey complained of pains in the neighborhood of the sternum which possibly indicated a condition of angina pectoris;

That on July 7, 1931, Dr. Hamel attended Mr. Wholey at Old Orchard Beach, Maine, diagnosed the attack from which Mr. Wholey suffered as angina pectoris and so told him on that day;

That Dr. Jones was called by a member of Mr. Wholey's family to attend him at Old Orchard Beach, that he attended him at his home and was told either by Mr. Wholey or by Mrs. Wholey in the presence of Mr. Wholey that Mr. Wholey had had a heart attack on that day, and that Dr. Jones gave Mr. Wholey a hypodermic and a sedative;

That on or about December 13, 1931, Mr. Wholey made a call on Dr. Nestor, complained of a digestive disturbance and complained of pains and numbness in the chest and pains and numbness radiating through his left arm, and that at that time Dr. Nestor told Mr. Wholey that he was having definite anginal symptoms;

That on or about December 15, 1931, Dr. Nestor was called to Mr. Wholey's home in the evening and Mr. Wholey complained of having severe constrictive substernal pains radiating down his arm and shoulder. When Dr. Nestor arrived the pains had subsided. Mr. Wholey was very pale, his face showed great anxiety and he was perspiring profusely. Dr. Nestor gave him a hypodermic injection, advised him to stay in bed for a week or ten days. On this visit Dr. Nestor told Mr. Wholey that he had angina pectoris;

That Mr. Wholey suffered from attacks of angina pectoris in July 1931 and in December 1931 and that the primary cause of the death of Mr. Wholey on May 3, 1932, was angina pectoris, and that the attacks which Mr. Wholey suffered in July and December 1931, and each of them, were material illnesses which seriously affected his expectation of life and that the non-disclosure by Mr. Wholey of his attacks in December 1931 was material, and that the diseased condition manifested by these attacks actually contributed to the contingency or event upon which the policy was to become due and payable and was primarily responsible for the death of Mr. Wholey;

That if the complainant had known the facts in respect to the attacks of July 1931, or of the attacks of December 1931, or any of them, it would not have reinstated his policy in January 1932, and if the complainant had known of the symptoms discovered by or disclosed to Dr. Nestor on his visits to Mr. Wholey in January 1931 and July 1931, it would not have reinstated the policy in January 1932.

I find that not until receipt of the proof of death executed by Mrs. Wholey on May 23, 1932, and receipt of the physician's certificate executed by Dr. Nestor on May 23, 1932, did any person acting as agent of the complainant have any knowledge that Mr. Wholey was not in sound health at the time the contract of reinstatement of his policy was made and it was not until after the death of Mr. Wholey that any person acting as agent of the complainant had any knowledge of the fact that he had been treated by Dr. Nestor at any time in 1931 or by Dr. Hamel or Dr. Jones in 1931, or that Mr. Wholey had suffered from the attacks for which he was treated by these physicians.

I further find that the company reinstated the policy in reliance upon the warranties in Mr. Wholey's applications to the effect that he had no illness; that he was in good health, and that he had consulted no doctor, as modified by his information regarding Dr. Cummings, Dr. Lalonde and Dr. Palmer.

The findings of fact made in this

case bring it within the allegations of the bill which was before the Supreme Court on demurrer.

The only variance between the allegations of the bill and the proof is this: the bill alleged in paragraph eighth that after the attacks in December 1931, Mr. Wholey remained in bed on account of this seizure for more than a week. This portion of the allegation was not made out by proof but is an immaterial variance.

The respondents contend that in order for the complainant to prevail, it is incumbent on it to show that Mr. Wholey believed that he was suffering from attacks of angina in December and that the complainant has failed to show this.

This contention is without merit. The decision of the Supreme Court forecloses this defence. That Court ruled that the bill stated a case for relief and the complainant has sustained the bill in its material allegations by proof and in the bill there is no allegation that Mr. Wholey believed he was suffering from angina pectoris.

I ruled that before consummating the reinstatement of the policy in January 1932, Mr. Wholey was under a duty to disclose to the complainant the fact that he had consulted Dr. Nestor on two occasions in December 1931, and to disclose to the complainant the diagnosis of the attacks which Dr. Nestor told him he made, and his failure to do so furnishes ground for rescinding the reinstatement of the policy involved in this case.

Early in the hearings and while the complainant was putting on its case, this Court allowed an amendment of the bill setting forth in substance that before October 24, 1931, and during the year 1931, on two occasions Mr. Wholey had consulted Dr. Nestor and had complained to him of cardiac pains, possibly indicating a condition of angina pectoris.

A reference to the applications for reinstatement executed by Mr. Wholey on October 30, 1931, and on November 12, 1931, discloses the fact that on each application he stated that he had not been ill since last examined by the company; that he had not consulted a physician since last examined, and that he was in sound health.

These statements were later modified by information which he gave Dr. Hill in respect to consulting Dr. Cummings, Dr. Lalonde and Dr. Palmer, but he never disclosed the fact that he did consult Dr. Nestor in 1931 on two occasions, once in January and once in July.

The answers made to questions 1, 2 and 6 in Section D of the applications were false and untrue on the findings of fact heretofore made in this case and furnish ground for the rescission of the contract.

I further find that such warranties, insofar as they failed to disclose the attacks which Mr. Wholey had in January and July 1931, when he was attended by Dr. Nestor, and insofar as they failed to disclose that he was attended by Dr. Nestor, were material, and the diseased condition manifested by these attacks actually contributed to the contingency or event upon which the policy was to become due and payable.

### V. Laches.

There were no laches on the part of the company. The proof and findings made herein show that it had no knowledge of the actual situation in regard to Mr. Wholey's state of health or of the facts in regard to his consultations or treatments by Dr. Nestor, Dr. Hamel and Dr. Jones until after his death, and suit was brought within a reasonable time after it obtained its first information relating to the validity of the reinstatement contract.

### VI. Extended Insurance.

Both respondents contend that the

beneficiary is entitled to extended insurance under the terms of the policy.

Neither answer sets up this demand by way of cross-relief. Moreover, neither the beneficiary nor the assignee has any title to such relief.

The contract of insurance vests certain rights in the policy holder in the event of a lapse of the policy. The policy is thereupon effective for paid up insurance but it is provided that "In lieu of such paid up insurance the insured may by written notice filed at the home office within the days of grace elect to have the policy continue as extended insurance".

The short answer to the contention of the respondents is that Mr. Wholey did not elect to take the benefit of extended insurance and there is no evidence that the company in any way prevented him from electing such an alternative.

The complainant is entitled to a decree rescinding the contract of reinstatement. Any further questions arising as to the exact amount to which the respondents are entitled upon rescission may be settled on entry of final decree.

For complainant: Claude R. Branch.

For respondent: Messrs. Comstock & Canning, John P. Beagan, Esq.